**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**50 ACRES OF LAND, etc., et
al., Defendant,**

**The City of Duncanville,
Defendant-Appellant.**

No. 81–1615.

United States Court of Appeals,
Fifth Circuit.

June 13, 1983.

Rehearing and Rehearing En Banc
Denied Sept. 19, 1983.

Saner, Jack, Sallinger & Nichols, Peter G. Smith, H. Louis Nichols, Dallas, Tex., for defendant-appellant.

Thomas H. Pacheco, Dirk D. Snel, Raymond N. Zagone, Appellate Sect., Land & Natural Resources, Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before BROWN and JOLLY, Circuit Judges, and MAHON *, District Judge.

JOHN R. BROWN, Circuit Judge:

Today we find ourselves lodged among melon rinds, coffee grounds, countless tin cans and sundry other unlikely neighbors amidst the City of Duncanville sanitary landfill. In this ignoble setting, we examine one of our most treasured constitutional principles—the Fifth Amendment's precept that private property shall not be taken for public purposes without just compensation. We consider the question of what constitutes the payment of "just compensation" to a public condemnee who has a duty to replace a condemned public facility. Appellee, the United States, contends that Duncanville is entitled only to the fair market value of its old landfill, which was condemned by the government. Duncanville argues that just compensation is the cost of a substitute landfill. We agree with Duncanville and conclude that under the Fifth Amendment a public condemnee which has a legal or factual duty to replace a condemned facility is entitled to the reasonable cost of a functionally equivalent substitute facility. We conclude also that the trial court's instruction concerning the substitute facilities standard was inadequate to enable the jury to make an intelligent determination of that cost. Accordingly, we remand for a new trial.

* District Judge of the Northern District of Texas, sitting by designation.

Indeed, this case is redolent with Fifth Amendment issues, as Duncanville objects also to the trial court's award of 6% interest under the Declaration of Taking Act, 40 U.S.C. § 258a. This Court has very recently held that the 6% rate is a floor, not a ceiling, on allowable rates of interest in this situation, and that the refusal to allow a higher rate of interest may be a denial of just compensation under the Fifth Amendment. *U.S. v. 329.73 Acres of Land, Situated in Grenada and Yalobusha Counties, State of Mississippi,* (5th Cir.1983) (*en banc*) 704 F.2d 800. As we remand for a new trial on the issue of the reasonable cost of a substitute facility, we also remand to the district court the question of a proper rate of interest.

Duncanville is a small home rule city of approximately 28,000 people located in the southwest portion of Dallas County, Texas. It operated a sanitary landfill on a tract of approximately 50 acres southwest of the city, along Ballwag Road in Dallas County, near the Tarrant County line. The United States condemned this tract (the Ballwag site) pursuant to the construction of Lakeview Lake, a redundantly named U.S. Army Corps of Engineers flood control project.[1] In accordance with the provisions of the Declaration of Taking Act, the government deposited its estimated value of the condemned property, $199,950.00, into the registry of the Court.[2]

For approximately two years after the taking of the Ballwag site, Duncanville trucked its daily garbage to a landfill near Ferris, Texas, some 22 miles to the southeast. It then acquired a new site of its own in northwest Ellis County (the Ellis County site), approximately the same driving time from Duncanville as the Ballwag site. This site consists of approximately 113.7 acres. Duncanville has been using the Ellis County site since January 1, 1981.

Duncanville demanded a jury trial on the issue of compensation, contending that the amount offered by the government was inadequate because Duncanville was entitled to the reasonable cost of substitute facilities, rather than merely the fair market value of the condemned property. Duncanville asked for the cost of the Ellis County land, the costs of permitting and preparation, and the costs of the interim use of the Ferris landfill.

After the presentation of evidence and arguments, the trial judge submitted two special interrogatories to the jury. Special question number one required a finding as to the fair market value of the 50-acre Ballwag site, which the jury fixed at $225,-000. Special question number two required a finding as to the cost of supplying a functionally equivalent substitute landfill site, which the jury fixed at $723,654.01. The district court then concluded that as a matter of law the market value of the Ballwag site was the proper measure of compensation and entered judgment for $225,000.00. He set interest on the unpaid balance of $25,050.00 at 6%.[3] Duncanville appeals.

The Fifth Amendment to the U.S. Constitution provides,

[N]or shall private property be taken for public use, without just compensation.

The issue here is what measure of compensation is "just" when a public entity is obligated to replace its condemned public facility.

In *United States v. 564.54 Acres of Land, More or Less, Situated in Monroe and Pike Counties, Pennsylvania, (Lutheran Synod),* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979), the Supreme Court declined to discuss the precise question presented here. The Court ruled that the payment of fair market value is sufficient compensation to

---

1. The parties stipulated to October 3, 1978, as the date of taking.

2. This money was redeposited in an interest-bearing bank account and later withdrawn, with the accrued interest, by the City of Duncanville.

3. This amount, a total of $29,934.75, was deposited in the court's registry on December 29, 1981.

a private non-profit organization whose property is operated for a public purpose.

In *Lutheran Synod,* the Court acknowledged that generally an award of fair market value strikes "a fair 'balance between the public's need and the claimant's loss' upon condemnation of property for a public purpose." 441 U.S. at 512, 99 S.Ct. at 1857, 60 L.Ed.2d at 441, *quoting United States v. Toronto, Hamilton & Buffalo Nav. Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). Nevertheless, the Court recognized and reaffirmed that fair market value is not and cannot be the single, inflexible measure of just compensation.

"[W]hen market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards.... Whatever the circumstances under which such constitutional questions arise, the dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?"

441 U.S. at 512, 99 S.Ct. at 1857, 60 L.Ed.2d at 442, *quoting United States v. Commodities Trading Corp.,* 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950). *See also United States v. 320.0 Acres of Land, More or Less, in the County of Monroe, State of Florida,* 605 F.2d 762, 780–81 (5th Cir.1979).

The substitute facilities doctrine arose from that realization that "just compensation" and "fair market value" are not always synonymous. Its genesis is in language written by Chief Justice Taft in *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923). In *Brown,* three-quarters of the town of American Falls, Idaho, was to be inundated and destroyed by the waters of a reservoir on the Snake River. In that extreme situation, the Chief Justice observed, "a method of compensation by substitution would seem to be the best means of making the parties

whole." 263 U.S. at 83, 44 S.Ct. at 94, 68 L.Ed. at 180.[4]

▬ Generally, the substitute facilities standard has been applied to the condemnation of streets, alleyways, bridges, sewers, and other public facilities for which fair market value cannot accurately be determined. Numerous cases have recognized and applied this principle. *See, e.g., United States v. Streets, Alleys and Public Ways in Village of Stoutsville, in Monroe County, Missouri,* 531 F.2d 882 (8th Cir.1976); *County of Sarpy, Nebraska v. United States,* 181 Ct.Cl. 666, 386 F.2d 453 (Ct.Cl.1967); *United States v. Certain Lands Located in the Townships of Raritan and Woodbridge, Middlesex County, New Jersey,* 246 F.2d 823 (3rd Cir.1957); *Town of Clarksville, Va. v. United States,* 198 F.2d 238 (4th Cir. 1952); *City of Fort Worth, Tex. v. United States,* 188 F.2d 217 (5th Cir.1951); *United States v. Los Angeles County, Cal.,* 163 F.2d 124 (9th Cir.1947); *United States v. Des Moines County, Iowa,* 148 F.2d 448 (8th Cir.1945); *Jefferson County, Tennessee v. Tennessee Valley Authority,* 146 F.2d 564 (6th Cir.1945). If no substitute facility is necessary, fair market value will be the standard for compensation, when it can be ascertained. *See United States v. 3,727.91 Acres of Land, More or Less, in County of Pike, State of Missouri (Ellsberry Drainage District),* 563 F.2d 357 (8th Cir.1977); *United States v. Certain Property in Borough of Manhattan, City, County and State of New York,* 403 F.2d 800 (2d Cir.1968); *State of California v. United States,* 395 F.2d 261 (9th Cir.1968). Often, however, only nominal damages are justified where streets, highways and the like need not be replaced. *See, e.g., Village of Stoutsville, supra; Franklin County, Georgia v. United States,* 341 F.2d 106 (5th Cir.1965), *State of Washington v. United States,* 214 F.2d 33 (9th Cir.1954); *Woodville, Okla. v. United States,* 152 F.2d 735 (10th Cir.1946).

---

4. As Justice Marshall points out in *Lutheran Synod,* 441 U.S. at 509, 99 S.Ct. at 1856, 60 L.Ed.2d at 439, *Brown* addressed the scope of the government's condemnation power. Its reference to substitution as a proper measure of compensation must be viewed as dictum. Recognizing this, we do not rely upon *Brown* as authority for our decision today, but mention it only for its historical importance.

This is a rather different case. Unlike the vast majority of substitute facility cases, here the parties agree that the landfill has a determinable market value, although at trial they disagreed as to what that value was.[5] The United States contends that because fair market value can be ascertained, that value must be the measure of compensation. We conclude, however, that the reasonable cost of a functionally equivalent facility is the just measure of compensation when a public entity is obligated to replace the condemned property.

■■■■ Although the indemnity principle which animates the just compensation clause of the Fifth Amendment "has not been given its full and literal force," *Lutheran Synod,* 441 U.S. at 510–11, 99 S.Ct. at 1856–57, 60 L.Ed.2d at 440, it must nevertheless be our aim to place a condemnee "in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236, 1244 (1934). *See also 320.0 Acres of Land,* 605 F.2d at 780. The purpose of just compensation is to reimburse the owner/condemnee for the loss he has suffered by the taking of the property.

Duncanville's situation is very different from that of the typical private landowner,

or that of the nonprofit condemnee in *Lutheran Synod.* As the Supreme Court emphasized,

> [R]espondent [Synod] is under no legal or factual obligation to replace the camps, regardless of their social worth. As a private entity, respondent is free to allocate its resources to serve its own institutional objectives, which may or may not correspond with community needs. Awarding replacement cost on the theory that respondent would continue to operate the camps for a public purpose would thus provide a windfall if substitute facilities were never acquired, or if acquired, were later sold or converted to another use.

441 U.S. at 515–16, 99 S.Ct. at 1859, 60 L.Ed.2d at 444.

■■■■ In contrast, in order to continue to provide a necessary public service, Duncanville presumably was required to spend certain monies to purchase a new landfill site and prepare that site for its purpose.[6] Its loss from the condemnation was the amount of money reasonably spent in that venture to create a functionally equivalent facility. To deny Duncanville reimbursement for its unavoidable loss would be to deny just compensation.

---

5. That controversy was, of course, settled by the jury. Its finding of $225,000 is somewhat more than the highest figure suggested by the government and considerably less than the lowest figure suggested by Duncanville.

6. The collection and disposal of garbage by a municipality is a governmental function imposed by law. *City of Fort Worth v. George,* 108 S.W.2d 929 (Tex.Civ.App.—Fort Worth, 1937, *writ ref.*). For the purposes of this appeal, the government does not directly challenge the fact that Duncanville was thereby obligated, either by law or practical necessity, to maintain a sanitary landfill. Solid waste disposal and sanitary landfills are regulated under Tex.Rev.Civ.Stat.Ann. art. 4477–7 (Vernon Supp.1982).

The decision as to whether substitute facilities are in fact necessary is a question for the trial court. *Wardy v. United States,* 402 F.2d 762, 763 (5th Cir.1968). Here the court made no finding on the issue, which should be decided on remand. At trial and on appeal, the

United States has mentioned testimony to the effect that Fort Worth has been contracting out its garbage collection to private firms. The most that can be said from this mention is that the government is attempting to cast doubt on the necessity for Duncanville to maintain a sanitary landfill. If so, this can be remedied on the hearing on remand.

We remind the trial court that in considering this question, it is not enough for the government to demonstrate a "reasonably adequate" or "reasonably passable" alternative method of garbage collection which does not require city operation of a sanitary landfill. The City is entitled to a facility or method which will dispose of the refuse of its citizens "in an equally adequate manner as would have been true had there been no condemnation." *City of Fort Worth,* 188 F.2d at 221. This necessitates the acknowledgement and consideration of any practical, economic or logistical advantages of the City's operation and control of its own sanitary landfill.

The Second Circuit has reached the same conclusion. *Certain Property in Borough of Manhattan, supra; United States v. Certain Property in Borough of Brooklyn,* 346 F.2d 690 (2d Cir.1965). *Certain Property in Borough of Manhattan* is particularly instructive. That case dealt with the condemnation by the Post Office Department of a public bath and recreation building owned and operated by New York City. As here, it was agreed that the building had a market value. The City contended that it had a duty to replace the condemned structure and that it was entitled to the cost of the functionally equivalent facility. The United States argued that the City had no legal requirement to replace the building and that in any event market value was the proper standard of compensation.

The Second Circuit, reversing the district court, held for the City. It concluded,

The 'substitute facilities' doctrine is not an exception carved out of the market value test; it is an alternative method available in public condemnation proceedings. [Citations omitted] When circumstances warrant, it is another arrow to the trier's bow when confronted by the issue of just compensation.

When the public condemnee proves there is a duty to replace a condemned facility, it is entitled to the cost of constructing a functionally equivalent substitute, whether that cost be more or less than the market value of the facility taken. [Citations omitted] The duty may be legally compelled or one which arises from necessity.... We hold, therefore, that if the structure is reasonably necessary for the public welfare, compensation is measured not in terms of "value" but by the loss to the community occasioned by the condemnation.

403 F.2d at 803–04.

That loss to the community is the cost of providing the necessary substitute facility. As we pointed out in *City of Fort Worth,* where we also rejected a strict view of the meaning of "necessity", "In any proper view of the requirements of just compensation, the substitute 'necessary' is that neces-

sary to readjust [the City's] street and highway system to serve the municipality's requirements and needs in as adequate a manner and extent and with equal utility as such system would have provided had the facility in question not been condemned, so far as this is reasonably practical." 188 F.2d at 222. That view applies as well to the replacement of the landfill condemned here.

In *United States v. State of South Dakota Game, Fish and Parks Department,* 329 F.2d 665 (8th Cir.1964), decided before either *Certain Property in Borough of Brooklyn* or *Certain Property in Borough of Manhattan,* the Eighth Circuit apparently reached a different conclusion. In that case, the United States had condemned a public park, also in order to build a reservoir. The trial judge, *sua sponte,* submitted a special interrogatory to the jury asking whether the state had an "obligation and need" to establish a substitute state park—a question which the jury answered in the affirmative. The court then awarded the state the cost of a substitute site.

The Eighth Circuit reversed. It held that the special interrogatory had impermissibly submitted a mixed question of law—"obligation"—and fact—"need"—to the jury. It concluded moreover that the substitute facility theory was improper because the market value of the condemned property was ascertainable.

We find it unnecessary to determine whether we would follow *South Dakota Game, Fish and Parks Department.* First, the finding of need was highly suspect in that case. Second, and more significant, in *Ellsberry Drainage District, supra,* a more recent case, the Eighth Circuit cited *Certain Property in Borough of Manhattan* and recognized that "[t]he substitute facilities doctrine is not an exception to the fair market value test but merely an alternate means of determining what just compensation is when a public facility is involved." 563 F.2d at 360. In a footnote, the Court observed, "Under the substitute facility doctrine if the structure is reasonably necessary for the public welfare, then the public

condemnee is entitled to the cost of constructing a functionally equivalent substitute. However, the key to the application of this doctrine is whether the facility need be replaced." 563 F.2d at 359, n. 2.

Considering the peculiarities of *South Dakota Game, Fish and Parks Department,* and in light of *Ellsberry Drainage District,* there is no indication that the Eighth Circuit would reach a result contrary to that which we reach today. If it would reach such a result, by this opinion which creates no conflict we must respectfully disagree, ally ourselves with the Second Circuit and conclude that here the measure of just compensation is the reasonable cost of a functionally equivalent substitute facility.

■ The trial court held that Duncanville had not met its burden of proving the cost of a functionally equivalent substitute facility and so had forfeited its case on the issue. With this we must disagree. Duncanville submitted evidence of the price of the land and of the expense of preparing the site. Witnesses testified that it was necessary to acquire the entire tract, at that price, in order to avoid more costly severance damage suits. We express no opinion as to the validity of these contentions, but we consider them sufficient to fulfill Duncanville's burden of presenting a case as to the cost of substitute facilities.[7]

An owner of condemned property "must be made whole but is not entitled to more." *Olson,* 292 U.S. at 255, 54 S.Ct. at 708, 78 L.Ed. at 1244. Accordingly, the district court should at least take into account the comments of the Second Circuit that

[E]quitable principles undergirding just compensation require that the substitution cost be discounted by reason of the benefit which accrues to the condemnee when a new building replaces one with expired useful years. With deference to

several contrary holdings, we believe the amount should be calculated and an appropriate deduction made. [Footnotes omitted]

403 F.2d at 804.

Here the City of Duncanville has perhaps gained noticeably from the replacement of the Ballwag fill with the new Ellis County site. The Ellis County site comprises 113.7 acres compared with 50 acres at Ballwag, some 15 of which had already been filled.[8] According to uncontradicted testimony, the Ellis County site can be filled to a depth of about 20 feet, as opposed to 10 feet at Ballwag. While the Ellis County site is approximately two miles farther away, it is accessible via faster roads. According to testimony, the Ellis County site has a potential life of approximately 41.6 years, while Ballwag was good only for about 12.8 years more. Generally there is disagreement as to the details of the comparative capacities of the two sites. But it is very clear that the Ellis County site is much better in terms of fillable acreage and life-span than Ballwag. In this particular tale of two landfills, Duncanville's garbage might well be heard to say, "It is a far, far better rest I go to, than I have ever known."

Although it recognized that Duncanville might be entitled to the cost of a reasonably necessary substitute facility, the trial court's instruction on special question number two did not take into account the need to deduct for the benefits which Duncanville gained from the acquisition of the new fill. The judge told the jury:

As I previously instructed you, fair market value may not be the sole measure of just compensation. The "cost of substitute facilities" is an alternative measure of just compensation in this case. I will now instruct you regarding this measure of just compensation in this case.

---

7. At trial the government presented evidence as to the actual cost of several "comparable" landfill sites. The record clearly shows that all but one of these sites were much too far from Duncanville to be even hypothetically suitable for use as Duncanville's municipal landfill. The government did not demonstrate that any tracts other than the Ellis County site were available for purchase for landfill use in the Duncanville area.

8. A portion of the Ballwag acreage was occupied by a creek. At trial there was some dispute as to whether that portion should properly be considered "fillable" acreage.

The burden is on the City of Duncanville to establish, by a preponderance of the evidence in the case, that the cost of substitute facilities was as much as the City claims. To "establish by a preponderance of the evidence" has been previously defined, and you are directed to refer back to that definition.

By cost of substitute facilities is meant that compensation due the City of Duncanville for the taking of its public facilities measured by the reasonable cost of supplying substitute facilities reasonably necessary to enable it to serve its constituents in approximately the same way as it would had the condemnation not occurred. It is a method of compensation by substitution. You are to determine the reasonable cost of construction of a functionally equivalent substitute sanitary landfill.

Simply stated, the cost of substitute facilities represents that amount of just compensation in money to be awarded which will sufficiently allow the City of Duncanville to provide for the replacement of the property and their public facility taken by the Government.

**9.** We do not adopt, or impose upon the district court, any particular method for making this determination. One possible approach, however, was suggested by the Second Circuit in *Certain Property Borough of Manhattan:*

> Several formulas are appropriate. The one that appears suitable under the facts in the present case is the mathematical formula: One minus the ratio that the remaining useful life of the condemned building [landfill] bears to the useful life expectancy of the substitute facility.

403 F.2d at 804, note 11.

**10.** Solely for purposes of illustration, we set forth below the list of costs which Duncanville claimed it incurred in the purchase and preparation of the Ellis County site:

| | | | |
|---|---|---|---|
| 1. | Land Cost (Actual) | $ | 583,400.00 |
| 2. | Relocating Mobil Pipeline (Actual) | | 282,406.63 |
| 3. | Site Preparation (Actual) | | 13,063.98 |
| 4. | Permanent Fencing (Actual) | | 15,290.52 |
| 5. | Off-Site County Road (Actual) | | 107,288.00 |

While this instruction fairly set forth the general purpose and meaning of "substitute facilities," we conclude that it was inadequate to enable the jury to make a fair and complete determination of the costs, including consideration of benefits received, of this particular substitute facility. The "reasonable cost" of a "functionally equivalent substitute sanitary landfill" is too brief a standard to ensure that the jury will balance these various positive and negative attributes.[9] Accordingly, we decline to adopt the jury's award of $723,624.01 and remand the case to the district court for a new trial.

Initially we leave the specifics of the charge to the sound discretion of the trial judge. Likewise, we express no opinion as to the merits or pecuniary accuracy of the various costs claimed by Duncanville.[10] We think it wise, however, to mention a few of the expenses for which Duncanville is entitled to compensation. Clearly Duncanville is entitled to reimbursement for the reasonable cost of an alternative site, along with the reasonable cost of preparing that site

| | | | |
|---|---|---|---|
| 6. | Relocating Stock Pond (Actual – $10,332.50, less $3,500.00) | $ | 6,832.50 |
| 7. | Engineering Study (Actual) | | 15,000.00 |
| 8. | Soils Investigation (Actual) | | 6,479.49 |
| 9. | Engineering for Soils Inspection of First and Second Cell Areas (Actual) | | 1,336.39 |
| 10. | Engineering for Soils Inspection of Additional Cells 150 Cells @ $700.00 Each (Estimated) | | 105,000.00 |
| 11. | Three (3) Groundwater Monitor Wells and Initial Resistivity Survey (Actual) | | 8,419.08 |
| 12. | Earth Resistivity Survey for Remaining Portion (Estimated – 20 yr. @ $1000/yr.) | | 20,000.00 |
| 13. | Trips to Midlothian and Austin by City Officials in Preparation of Permit | | 294.93 |
| 14. | Attorney Fees Obtaining Permit (Estimated) | | 1,000.00 |
| 15. | Addition Cost – Landfill Operations Ferris vs. Ballwag | | 76,927.70 |
| 16. | Additional Maintenance Cost Trips to Ferris Landfill | | 25,882.83 |
| 17. | Additional Fuel Cost Trips to Ferris Landfill | | 7,689.11 |
| | TOTAL | $ | 1,276,311.16 |

for use as a landfill. Whether the price actually paid is reasonable under the circumstances is for the jury to decide. In addition, Duncanville is entitled to those expenses incurred in using the temporary site at Ferris, over and above those which would have been incurred at Ballwag.

In holding as we do today, we imply no criticism of the able trial judge. He faced several difficult legal issues and gave them careful and thoughtful consideration. His conduct of the trial was judicious and fair throughout. Nevertheless we hold that the reasonable cost of functionally equivalent substitute facilities is the proper measure of compensation here and that the court's instruction to the jury was inadequate to enable it to make a fully informed and intelligent assessment of that cost.

Very recently, in *United States v. 329.73 Acres of Land, supra*, this Court held *en banc* that the 6% interest rate provided as delay damages by the Declaration of Taking Act "sets a floor, rather than a ceiling, on the rate of interest payable on the deficiency." 704 F.2d at 812. Neither the district court nor the government has undertaken to defend the constitutionality of a 6% interest ceiling. Instead the court held, and the government contends, that the City failed to introduce any evidence of an alternative appropriate interest rate; hence the use of the 6% "floor" is appropriate. The City admits its failure to introduce evidence, but contends that the district court erred in failing to take judicial notice of the prevailing rate of interest on U.S. Government Bills and U.S. Government Notes and Bonds for the time, as shown in Federal Reserve Bulletin No. 10, Volume 64, October, 1978.

In support of its argument that Duncanville's failure to introduce evidence justifies the use of the 6% interest floor, the government cites *United States v. 100 Acres of Land, More or Less, in Marin County, State of California (Drake's Beach)*, 468 F.2d 1261

(9th Cir.1972) and *United States v. 174.12 Acres of Land, More or Less, in the County of Pierce, State of Washington*, 671 F.2d 313 (9th Cir.1982). In *Drake's Beach*, as here, the landowner, after the jury had rendered its verdict, moved the trial court to award interest at the prevailing statutory rate, above 6%. The motion was denied and that denial affirmed on appeal. The Ninth Circuit held that the landowner should have presented evidence on the proper rate of interest at trial and that it was "not entitled to another trial to prove additional elements of just compensation which it could have presented during the original trial." 468 F.2d at 1270.

In neither *Drake's Beach* nor *174.12 Acres*, however, was a new trial ordered on the underlying issue of just compensation. Here we remand for a new trial. In light of that fact, and in light of the very recent nature of our *en banc* holding in *329.73 Acres*, we are of the opinion that the City should be allowed to present evidence of the proper rate of interest at trial. As in *329.73 Acres*, we do not attempt to set a formula for the calculation of a proper interest rate; instead we leave that factual determination for remand upon the evidence to be presented. Since the proper interest rate is an element of "just compensation," we consider the determination of that rate to be within the province of the jury as finder of fact. *Wardy, supra; Drake's Beach, supra.*[11]

The Ballwag landfill will soon be, if it has not already been, transmogrified into a muddy lakebed. It leaves behind this lawsuit as a memento of its former life. In that guise, it will linger for some while longer in the federal courts. We regret that we cannot allow it to rest in watery peace, but we conclude that a new trial is necessary to determine what just compensation the City of Duncanville shall receive for its passing.

REVERSED and REMANDED.

11. At issue here is the interest to be assessed for the period of time from the date of taking to the date of judgment. This interest rate is not addressed by section 302 of the Federal Courts Improvement Act of 1982, P.L. 97–194, 28 U.S.C. § 1961, which establishes a varying rate for post-judgment interest in federal district court civil cases.