NORTH ADAMS APARTMENTS LIMITED PARTNERSHIP *vs.* CITY OF NORTH ADAMS.[1]

No. 09-P-1677.

Berkshire. May 10, 2010. - January 18, 2011.

Present: McHUGH, SMITH, & SIKORA, JJ.

*Sewer. Municipal Corporations,* Sewers. *Eminent Domain,* Damages, Proceedings for damages. *Damages,* Eminent domain. *Practice, Civil,* Eminent domain proceeding.

Discussion of the standard of review applicable to review of a jury-waived trial involving the valuation of property taken by eminent domain. [607].

In a civil action arising from the defendant city's taking of the plaintiff's private sewer system for public use, the judge, sitting without a jury, correctly concluded that the plaintiff was entitled to no compensation for the taking, and in doing so properly rejected the valuation methods put forth by the plaintiff, where the plaintiff failed to demonstrate that it had suffered any measurable loss from the taking. [607-610]

CIVIL ACTION commenced in the Superior Court Department on August 23, 2007.

The case was heard by *John A. Agostini,* J.

*Wendy H. Sibbison (Richard J. O'Brien* with her) for the plaintiff.

*Richard M. Dohoney* for the defendant.

SMITH, J. The plaintiff, North Adams Apartments Limited Partnership, brought an action in the Superior Court against the city of North Adams (city), claiming fair compensation for the city's taking by eminent domain of the plaintiff's private sewer system. After a jury-waived trial, a judge entered a verdict in favor of the city, concluding that the plaintiff was not owed any

---

[1]The mayor of North Adams, the North Adams city council, and the city clerk of North Adams were also included as defendants in the plaintiff's complaint. At the time of trial, the plaintiff agreed to dismiss all claims against the defendants other than the city of North Adams (city).

damages for the taking of its private sewer system for public use. On appeal, the plaintiff claims that the judge erred in his valuation of the property taken, particularly with respect to his rejection of the plaintiff's proposed method of valuation.

1. *Background.* We summarize the facts found by the judge, supplemented with additional undisputed facts. The plaintiff is the owner of two parcels of land on West Shaft Road, a public way in the city. In 1989, the plaintiff began planning to construct an apartment complex on one parcel and a residential subdivision on the other parcel. The plaintiff's property, however, did not have any access to the city's sewer system because the nearest sewer line ended about 1,800 feet south of the plaintiff's property. Therefore, the plaintiff entered into negotiations with the city to determine if the city would allow the plaintiff to use the city's sewer system.

As a result of the negotiations, the plaintiff obtained an easement from the city in 1991 to construct a sewer system under West Shaft Road that would link the development to the municipal sewer system. According to the terms of the easement, in exchange for one dollar the plaintiff was given the right to "construct and maintain a sanitary sewer system . . . consisting of a six and an eight inch PVC pipe together with a duplex lift station and emergency standby power station running northerly under [West Shaft Road], with the right to connect said pipe to the sanitary sewer pipe of the City of North Adams lying under [West Shaft Road]." Under the agreement, the plaintiff also bore all construction, maintenance, and replacement costs associated with the new sewer system and agreed to keep it in good working order. The easement agreement also provided that the "sewer system shall remain property of North Adams Apartments Limited Partnership, its successors or assigns." The plaintiff completed construction of the sewer line extension, including the pumping station, in 1992 at a total cost of $136,540. With the sewer issue resolved, the plaintiff constructed an apartment development, known as Tunnel Brook Townhouses, on part of one parcel; the other parcel is to become a subdivision of single-family homes called Deep Woods.

On December 13, 2005, the North Adams city council voted to take the easement and sewer system by eminent domain. The

order of taking provided for a pro tanto payment of $10,000 (which the city contends was only a nuisance figure, the property taken having no value). Unsatisfied with the pro tanto award, the plaintiff filed a complaint in Superior Court on August 23, 2007, seeking additional compensation for the taking of the easement and the sewer system.

a. *The trial.* A bench trial was held in April of 2009, at which the parties presented expert testimony as to the damages owed for the taking of the sewer system.[2] To begin, both parties' experts agreed that the first step in valuing any property is to determine its highest and best use. It is undisputed that the property taken here, a sewer system, was "adapted to a single use and its value depended entirely upon a continuance of that use." *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.*, 335 Mass. 189, 197 (1956), quoting from *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 65 (1941). Therefore, the sole issue at trial was the value of the sewer system as a sewer system.

Both parties' experts further agreed that, once a property's highest and best use has been determined, there are three primary methods of appraising property. The Supreme Judicial Court in *Matter of the Valuation of MCI WorldCom Network Servs., Inc.*, 454 Mass. 635, 638-639 (2009), has summarized those approaches as follows:

> "The two preferred methods for conducting valuations of property are the 'market study method,' which compares the property at issue to similar, recently sold property, and the 'income capitalization method,' which calculates the present value of the income that property will produce. . . . However, those methods may be unavailing 'where the special character of the property makes it substantially impossible to arrive at value on the basis of capitalized net earnings or on the basis of comparable sales.' . . . In such circumstances, . . . a third method [may be used]: 'depreciated reproduction cost' (DRC), defined as '[t]he current cost of reproducing a property less depreciation from deterioration and functional and economic obsolescence.' " (Citations omitted.)

---

[2]The value of the easement itself was not a contested issue at trial and is not an issue on appeal.

The plaintiff presented the testimony of Roger Durkin, a certified general appraiser and valuation consultant. He testified that the plaintiff's sewer system was special use property, which he defined as property that seldom trades in the open market and for which there are typically no comparable sales. Durkin primarily used the DRC method in calculating the value of the sewer system. Using the DRC method, Durkin analyzed the costs associated with excavation and materials for each component of the sewer system, subtracted an amount for depreciation based on its age, and came to a figure of $271,370.

Durkin also offered a secondary opinion about the value of the sewer system using the income capitalization method. Under that approach, Durkin opined that at the time of the taking, the net income generating value of the property over the next five years (discounted to present value) was $235,000, which would accrue through sewer tie-in fees paid by neighboring properties that would switch from their failing septic systems to the municipal sewer system. Durkin arrived at that figure by multiplying the number of neighboring properties (twenty-two) by a tie-in fee of $20,000 per property, and subtracting for inflation and the cost to perform the work. According to Durkin, the hypothetical $20,000 fee was based on market value principles. In sum, Durkin characterized the value he reached as a "forecast based on demand and the number of properties in that area."

Michael Deep, a general partner of the plaintiff, also testified. Deep described the acquisition of the easement from the city, the construction of the sewer system, and its cost to build. Deep further testified that when the city took the sewer system it was in excellent condition, and that at that time no neighboring residents had tied into the system.

The city presented the testimony of James Fisher, a certified general appraiser experienced in commercial real estate appraisals. Fisher first explained that the foundation of his appraisal rested on his finding that the plaintiff built the sewer system to increase the market value of its two developments, Tunnel Brook Townhouses and Deep Woods. Such an increase would occur because a connection to a municipal sewer system eliminates the need for a private septic system, which requires costly replacement in the future. Because of this net benefit, according to Fisher, developers such as the plaintiff are more than

willing to build a connecting sewer system; however, they typically deed it to the city for one dollar after the development is constructed, in order to avoid the liabilities of owning and maintaining the system. Fisher based his knowledge on having valued over one hundred subdivisions, where, "[i]n virtually all of those analyses, [the sewers built] were deeded back to the town." Fisher thus opined that the "highest and best use" of the sewer system here would be to deed it to the city for no consideration or one dollar.

When asked about Durkin's appraisal, Fisher agreed that the market study approach was not viable, but disagreed with his use of the DRC method. Fisher opined that the DRC method was misused in this case because Durkin overinflated the cost to recreate the system in 2005, and failed to take into account other economic factors that would have affected the value under that method. Essentially, Fisher noted that the DRC method is "a less reliable indicator of value, when there's not an active market or income approach to back things up."

The city also presented the testimony of Leo Senecal, a special project coordinator for the city, and Bruce Collingwood, the commissioner of public works and utilities for the city of Pittsfield. Senecal testified that the sewer system's pumps and circuits required maintenance once or twice per month by individuals who were not city staff. He also noted that, at the time of trial, four homes were served by the sewer main, and that another fourteen to sixteen could hook up to the system for a fee of $2,000. One individual, Giroux, had also connected to the system, but was charged a larger fee because the line had to be extended 250 feet from the main to his property. After reaching an agreement with the city, Giroux paid $10,000, one-half of the total $20,000 cost to extend the line to his property, and the city paid the remainder. Collingwood testified about two occasions where a developer built a sewer system which it later conveyed to the city of Pittsfield for no consideration.

b. *The judge's decision.* In his memorandum of decision, the judge ruled that the fair market value of the sewer system at the time of its taking was "zero." In reaching that conclusion, the judge credited the testimony of both Fisher and Collingwood as to the routine conveyance of developer-built sewers to municipalities for no consideration. Specifically, the judge found that the

system is "a liability that any developer would attempt to shed for no monetary payment to avoid on-going and perpetual maintenance/replacement responsibilities in the future." In so concluding, the judge rejected Durkin's application of the DRC method because "this proposed method does not represent the fair market value of the property at the time of the taking because of the on-going liability imposed on the owner." He likewise rejected Durkin's use of the income approach, finding the $20,000 tie-in fee "exorbitant," and the likelihood that the neighboring property owners would pay that fee "beyond speculation," given that no neighboring resident had tied into the system during its fourteen-year existence prior to the taking.

On appeal, the plaintiff claims that the judge erred as a matter of law (1) in ruling that the plaintiff was entitled to "zero" when the city took the plaintiff's sewer system by eminent domain, and (2) in rejecting the DRC method. The plaintiff also claims that the judge committed error in adopting Fisher's opinion.

2. *Discussion.* a. *Standard of review.* We accept a trial judge's findings of fact unless they are clearly erroneous, but we apply de novo review to legal conclusions. See *Anastos* v. *Sable,* 443 Mass. 146, 149 (2004). Valuation is a question of fact, which we review for clear error. See *Sherburne* v. *Meade,* 303 Mass. 356, 360 (1939); *Haskell* v. *Versyss Liquidating Trust,* 75 Mass. App. Ct. 120, 125 (2009); *Portland Natural Gas Transmission Sys.* v. *19.2 Acres of Land,* 318 F.3d 279, 281 (1st Cir. 2003) (United States District Court judge's findings of fact, including the amount of compensation due in an eminent domain action, are reviewed for clear error). Deference is also given to the trial judge's credibility assessments of experts. See *Haskell, supra* at 125-126 ("within discretion of fact finder to place little or no weight on expert evidence"), citing *Commonwealth* v. *Cullen,* 395 Mass. 225, 229 (1985).

b. *Valuation of the plaintiff's sewer system.* "The duty of paying an adequate compensation, for private property taken, is inseparable from the exercise of the right of eminent domain." *Bromfield* v. *Treasurer & Recr. Gen.,* 390 Mass. 665, 668 (1983), quoting from *Haverhill Bridge Proprietors* v. *County Commrs. of Essex,* 103 Mass. 120, 124 (1869). A private sewer system is no different, and it cannot be taken by a municipality without just

compensation to its owner. See 11 McQuillin, Municipal Corporations § 31.09, at 194 (3d ed. rev. 2000). The fact that there is no open market for a sewer system does not mean that an owner of such a system cannot be compensated for its taking.

In determining just or adequate compensation for the taking, the goal is to indemnify the party whose property is taken. See *United States* v. *564.54 Acres of Land,* 441 U.S. 506, 510-511 (1979); *Drury* v. *Midland R.R.,* 127 Mass. 571, 576 (1879). Thus, the condemnee "is entitled to be put in as good a position pecuniarily as if [the] property had not been taken. [The condemnee] must be made whole but is not entitled to more." *Olson* v. *United States,* 292 U.S. 246, 255 (1934). See *Almota Farmers Elevator & Warehouse Co.* v. *United States,* 409 U.S. 470, 473-474 (1973).

When valuing the property taken, "[t]he just compensation to which an owner is entitled . . . is regarded in law from the point of view of the owner and not the condemnor. In other words, just compensation in the constitutional sense is what the owner has lost, not what the condemnor has gained." 4 Nichols, Eminent Domain § 12.03 (rev. 3d ed. 2002). See *Brown* v. *Legal Foundation of Washington,* 538 U.S. 216, 235-237 (2003). See also *Boston Chamber of Commerce* v. *Boston,* 217 U.S. 189, 195 (1910).[3] Therefore, under these principles, not all takings give rise to an obligation to pay compensation. See *Brown, supra* (plaintiffs not entitled to compensation for the taking of the interest on their deposited IOLTA funds because they suffered no pecuniary losses). See also *Marion & Rye Valley Ry. Co.* v. *United States,* 270 U.S. 280, 282 (1926) (even assuming government had assumed actual possession and control over railroad company during disputed period, "[n]othing was recover-

---

[3]Among other things, the plaintiff argues on appeal that its sewer system was worth more than "zero" when the city took it because a study completed by the city had determined that the cost to the city to build a sewer system parallel to the one ultimately taken by eminent domain would be $196,625. As we have pointed out *supra,* "just compensation in the constitutional sense is what the owner [here, the plaintiff] has lost, not what the condemnor [here, the city] has gained." 4 Nichols, Eminent Domain § 12.03. Therefore, because the value of any benefit the city may receive from the taking is irrelevant to our determination, we reject the plaintiff's argument.

able as just compensation, because nothing of value was taken from the company; and it was not subjected by the Government to pecuniary loss").

If damages are owed, they are generally measured by "the fair market value of the property at the time of the taking." *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. 360, 361 (1978). "Fair market value is determined on the basis of the highest and best use to which property could reasonably be put." *Douglas Envtl. Assocs., Inc.* v. *Department of Envtl. Protection*, 429 Mass. 71, 75 (1999).

Thus, before any valuation can be undertaken, a threshold issue must be resolved; namely, whether the plaintiff suffered *any* pecuniary losses when the city took the sewer system by eminent domain, measured from the perspective of the plaintiff's loss, rather than the city's gain. Here, the judge found that the plaintiff suffered no measurable loss when the city took its sewer system, for the following reasons. First, the plaintiff benefited from the taking because it continued to be served by the system but was no longer responsible for its maintenance. This conclusion is supported by the testimony of Collingwood and Fisher, who described the common transaction of developers who are "more than happy and willing, [and] actually jump through hoops, so that they can have [their privately built sewer systems] deeded back to the city" for no consideration. Second, any future income the plaintiff would have earned from sewer tie-ins was purely speculative.[4] The judge's findings are supported by the record and are not clearly erroneous. Because no pecuniary losses were

---

[4]The plaintiff argues that the judge rejected the income approach on the basis of his erroneous finding that the city could terminate the easement agreement at any time. The findings were unrelated. The judge found the income approach to be speculative because "[f]rom the time the sewer extension was fully operational, [fourteen] years have elapsed and no resident agreed to connect to the system. Since the eminent domain taking only three property owners have connected to the municipal sewer system, however, for a fee of only $2175.00 — the cost of the connection. To accept the argument that within the next two years all of the remaining residents will take advantage of this opportunity is simply contrary to the historical record. This would be particularly true given the fact that the cost to any future user would be considerably higher than [to] the three recent connectors." The judge also distinguished the amount paid by Giroux, as his connection involved a special accommodation due to the distance of his residence from the sewer line.

suffered, the DRC and income valuations put forth by the plaintiff were properly rejected.[5]

Further, as the judge stated, the result reached has a common-sense quality to it. Unlike a typical eminent domain scenario, wherein a condemnee loses valuable rights and retains no individual benefit from the property taken, the taking here cost the plaintiff nothing. The evidence shows that the plaintiff built a sewer system at its own cost, as is the common practice among developers, because it was necessary for its housing investments. The plaintiff was then able to recoup those costs when it rented the housing and, in the future, will be able to earn more profits if it sells subdivision lots hooked into the already built sewer. The taking by the city did not interfere with this investment equation and thus caused no loss to the plaintiff. Because future income could not be proved, see *Beals* v. *Inhabitants of Brookline*, 245 Mass. 20, 25-26 (1923), and *Demers* v. *Montpelier*, 120 Vt. 380, 389-390 (1958), no losses were incurred from the taking in that respect as well. As the plaintiff has simply failed to prove how it is in a worse position financially following the taking in this case, it is not entitled to compensation.

*Judgment affirmed.*

---

[5]The plaintiff cites *Manchester Dept. of Util.* v. *Even Ray Co.*, 315 N.J. Super. 122 (App. Div. 1998) (*Even Ray*), in support of its position that the judge erroneously concluded that the DRC method was inappropriate in this case. Before reaching the specifics of calculating compensation, and which method would be appropriate, *id.* at 134-136, the court in *Even Ray* had to first determine that the private developer in that case was entitled to compensation. In making the threshold determination that it was, the court examined the issue of value from the perspective of a potential buyer or condemnor, as framed by the plaintiff on appeal. *Id.* at 132 ("Plaintiff argues that the judgment is unsupported by any evidence that the property interests taken have any value to any party other than plaintiff"). As we have discussed *supra*, however, value must be determined from the perspective of any loss to the condemnee. In *Even Ray*, the court failed to observe that the developer in that case, as here, was in no worse position as to the physical components of his sewer after they were taken. Because in our estimation the court viewed the case through the wrong lens, we deem any subsequent determinations it made as to valuation method irrelevant to our determination.